# CohenMalad

## TRIAL LAWYERS

October 1, 2025

Hon. Naomi Reice Buchwald

United States District Court
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Application granted.  The parties' proposed
schedule for the filing of an amended
consolidated complaint and defendant's
motion to dismiss is approved.

SO ORDERED.

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Date:    October 3, 2025
         New York, New York

Re:    *Miller v. Fiverr Inc.*, Case No. 1:25-cv-02684-NRB (lead action)
       *Johnson v. Fiverr Inc.*, Case No. 1:25-cv-05079-NRB (consolidated into *Miller*)
       Consent to Amend Complaint and Stipulation on Motion to Dismiss Briefing Schedule

Dear Judge Buchwald:

We write jointly on behalf of Plaintiffs and Defendant in the above-referenced cases regarding the parties' stipulation, subject to Court approval, for the Court to enter a briefing schedule on Defendant's motion to dismiss Plaintiffs' amended consolidated complaint, to be filed with all parties' consent.

**Background**

On August 11, 2025, the Court granted the parties' stipulation to consolidate the above-referenced cases into the *Miller* action.  ECF No. 25.  On September 8, 2025, Plaintiffs filed their Consolidated Complaint.  ECF No. 26.  Defendant's motion to dismiss is currently due on October 7, 2025.  *See* ECF No. 25.[1]

Plaintiffs seek Defendant's consent to amend their Consolidated Complaint to add another plaintiff and related allegations.  *See* Fed. R. Civ. P. 15(a)(2) (permitting amendment with all parties' written consent).  A redline copy of the proposed amended consolidated complaint is attached to this letter as Exhibit A.

Defendant consents to Plaintiffs' proposed amendments.  In turn, the parties have agreed to a briefing schedule that considers the Jewish holidays, significant conflicts of multiple of Defendant's counsel team in October (scheduled intentionally after the current motion to dismiss

---

[1]    For the avoidance of doubt and to conserve judicial and party resources, unless the Court orders otherwise, given this stipulation and the upcoming deadline, the parties agree that Defendant need not respond to the current Consolidated Complaint and may wait until further order by the Court regarding this stipulation.

**CohenMalad, LLP**

One Indiana Square, Suite 1400  .  Indianapolis, IN 46204  .  Office 317.636.6481  .  Fax 317.636.2593  .  cohenmalad.com



deadline), and that one of Defendant's primary counsel will be on parental leave because his child is due to be born in the first week of December.

In addition, because the *Johnson* action has been consolidated into the *Miller* action and because a third plaintiff will be added to these consolidated cases, the parties agree, subject to Court approval, that there is good cause to slightly expand the word limits of Local Civil Rule 7.1(c) as follows: (1) motion and opposition memoranda—10,000 words; and (2) reply memorandum—4,500 words.

### **Stipulation**

The parties respectfully request that the Court enter the following schedule on Defendant's motion to dismiss the proposed amended consolidated complaint attached as Exhibit A, to be filed with the parties' consent:

- **October 14, 2025**: Plaintiffs file proposed amended consolidated complaint (Exhibit A);

- **November 18, 2025**: Defendant files motion to dismiss (memoranda of law/brief of 10,000 or fewer words);

- **January 9, 2026**: Plaintiffs file opposition to motion to dismiss (memoranda of law/brief of 10,000 or fewer words); and

- **January 30, 2026**: Defendant files reply in support of motion to dismiss (memoranda of law/brief of 4,500 or fewer words).

Sincerely,

/s/ *Lynn A. Toops*

COHENMALAD, LLP
Lynn A. Toops (*pro hac vice*)


*Attorney for Plaintiffs Andrew Miller*
*and Marcus Johnson*

/s/ *Julian A. Lamm*

WHITE & CASE LLP
David G. Hille
Julian A. Lamm (*pro hac vice*)
Russell J. Gould (*pro hac vice*)

*Attorneys for Defendant Fiverr, Inc.*



IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW MILLER and JONATHAN HAGEMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FIVERR, INC.,<br><br>Defendant. | Case No.: 1:25-cv-02684-NRB |
| MARCUS JOHNSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FIVERR, INC.,<br><br>Defendant. | Case No. 1:25-cv-05079-NRB |

## AMENDED CONSOLIDATED COMPLAINT

Plaintiffs Andrew Miller, Jonathan Hageman, and Marcus Johnson, on behalf of themselves and all others similarly situated, complain of Defendant Fiverr, Inc., as follows, on information and belief except as to their own experiences and matters of public record:

### INTRODUCTION

1.     This amended complaint consolidates for administrative purposes only the claims of Plaintiff Andrew Miller in *Miller v. Fiverr, Inc.*, No. 1:25-cv-02684-NRB, and the claims of Plaintiff Marcus Johnson in *Johnson v. Fiverr, Inc.*, No. 1:25-cv-05079-NRB. *See* ECF No. 25. These cases are not merged and retain their separate identities. *See Hall v. Hall*, 584 U.S. 59, 76–

77 (2018). This complaint also joins Plaintiff Jonathan Hageman to *Miller v. Fiverr, Inc.*, No. 1:25-cv-02684-NRB.

2.     "When shopping for a good or service, consumers want to know: how much?"[1]

3.     "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[2]

4.     One such unfair and deceptive practice is called "drip pricing."

5.     "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

6.     Drip pricing is a form of dishonest bait-and-switch advertising.

7.     For this reason, it is prohibited by New York, California, and federal consumer protection law.

8.     Fiverr, the owner and operator of an online freelancing platform, does just what the law prohibits. Over and over again, it lists one upfront price to entice consumers into making a purchasing decision, only to pull the rug out from under their feet at the last stage of the transaction by adding hidden, mandatory junk fees when consumers have already decided to complete the transaction in reliance on the upfront price.

9.     Plaintiffs Andrew Miller, Jonathan Hageman, and Marcus Johnson purchased certain services on Fiverr, the price of which was misleadingly and unlawfully advertised as lower than the total prices Plaintiffs would pay after Fiverr smuggled in its junk fees just as they were completing the transactions.

---

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] *Id.*

10.     On their own behalf and on behalf of all other similarly injured consumers, Plaintiffs bring these actions to put a stop to Fiverr's illegal business practices and to remedy the injuries they have caused.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction of these actions under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this Court as to both actions under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District; under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and, as to the *Johnson* action, under § 28 U.S.C. § 1404(a), because all parties have consented to venue in this District.

## PARTIES

13.     Plaintiff Andrew Miller is a resident of Oakland, California.

14.     Plaintiff Jonathan Hageman is a resident of Riverside, California.

15.     Plaintiff Marcus Johnson is a resident of Oakland, California.

16.     Defendant Fiverr, Inc. is a corporation incorporated in Delaware with its principal place of business at 38 Greene St., New York, NY 10013.

## FACTUAL ALLEGATIONS

### I.    Drip pricing harms consumers.

17.    "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[3] Hidden fees are a kind of "junk fees."[4] Such fees are "mandatory but not transparently disclosed to consumers."[5] Consumers may be "lured in with the promise of a low price, but when they get to the register, they discover that price was never really available."[6] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[7]

18.    The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[8] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[9] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[10]

19.    As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[11]

---

[3] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14 .2022%20-%20FINAL.pdf/.
[4] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").
[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.
[6] *Id.*
[7] *Id.* n.2.
[8] *Bringing Dark Patterns to Light*, *supra* note 3, at 8–9.
[9] *Id.* at 8.
[10] *Id.* at 9.
[11] *Id.* at 23, 30.



20. Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[12] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[13]

21. "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase, "abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[14]

---

[12] *Id.* at 9.
[13] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_archit ecture_discussion_paper.pdf/.
[14] *Id.* at 30.

22.     In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[15]

23.     Drip pricing harms consumers.

24.     "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[16]

25.     "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[17]

26.     As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous and makes it extremely difficult for consumers to make informed decisions."[18]

27.     As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert, fly home to see a sick loved one—that's just not fair."[19]

---

[15] *Id.*

[16] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.

[17] *Online Choice Architecture*, *supra* note 13, at 30.

[18] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).

[19] *Id.*

28.     "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[20]

29.     According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[21]

30.     Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[22]

31.     Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[23]

32.     Drip pricing harms honest businesses too.

33.     An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[24]

34.     Drip pricing thereby harms free and fair competition.

35.     "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on

---

[20] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.
[21] *Id.*
[22] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.
[23] *Online Choice Architecture*, *supra* note 13, at 30.
[24] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.

less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[25]

36.    One study found that sellers "set the highest possible drip price, and compete only on base prices."[26]

37.    For this reason, drip pricing is difficult or impossible to correct using only market pressures.[27]

38.    The law must intervene.[28]

## II.    State and federal consumer protection laws protect consumers against drip pricing.

39.    New York law prohibits "[d]eceptive acts or practices in the conduct of any business,"[29] including "[f]alse advertising."[30]

40.    For more than 65 years, New York has held bait-and-switch schemes like drip pricing to be "deceptive and harmful to the public interest."[31]

41.    More recently, the sponsor of a bill regulating event ticket sales, which, among other things, prohibited drip pricing, noted the bill incorporated recommendations generated by a legislative investigation into the ticketing industry "due to concerns about potentially unfair, deceptive, and anti-consumer practices."[32]

42.    California law likewise prohibits drip advertising.

---

[25] *Online Choice Architecture*, *supra* note 13, at 30.

[26] *Drip Pricing and Its Regulation*, *supra* note 22.

[27] *See id.* at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").

[28] *See id.* (discussing regulatory interventions).

[29] N.Y. Gen. Bus. Law § 349(a).

[30] *Id.* § 350.

[31] *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 204 (N.Y. 1959).

[32] S.B. 9461-244, Sponsors Mem. (N.Y. 2022). The enacted bill amended several sections of the New York Arts and Cultural Affairs Law. *See* 2022 N.Y. Sess. Laws ch. 358 (McKinney). The drip pricing provision is codified at N.Y. Arts & Cult. Aff. § 25.07(4).

43.     "[T]he price a Californian sees should be the price they pay."[33] This straightforward, commonsense proposition underlies California Senate Bill 478, effective July 1, 2024, codified at Cal. Civ. Code § 1770(a)(29), called the "Honest Pricing Law" or "Hidden Fees Statute."

44.     The Honest Pricing Law was enacted to suppress the dishonest bait-and-switch of drip pricing. The Legislature declared that SB 478 is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service,"[34] and identified drip pricing as a form of "bait and switch advertising."[35]

45.     As the California Attorney General has summarized succinctly, "The law requires honest pricing. It prohibits businesses from '[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges' other than government-imposed taxes or fees or reasonable shipping costs."[36]

46.     "Honest pricing" means not just that junk fees are disclosed at some point in the transaction. "Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction? No. The advertised or listed price must be the full price that the consumer is required to pay. … If a business chooses to list a price for a good or service, the

---

[33] Cal. Dep't of Justice Off. of the Att'y Gen., *SB 478 Frequently Asked Questions* 1 (emphasis omitted), https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf/ (last accessed September 19, 2025).
[34] S.B. 478, 2023–2024 Leg. § 1(a) (Cal. 2023).
[35] *Id.* § 1(b).
[36] Cal. Dep't of Justice Off. of the Att'y Gen., *supra* note 33, at 1 (quoting Cal. Civ. Code § 1770(a)(29)(A)).

advertised price must be the entire amount the consumer will have to pay, not including any fees for optional services or features, taxes, or shipping charges."[37]

47.     Further, "like other forms of bait and switch advertising," drip pricing is "prohibited by existing [California] statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)."[38]

48.     Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[39]

49.     The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[40] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[41] Consumers would invariably find that the advertised car could "only be purchased for a higher

---

[37] *Id*. at 2–3.
[38] S.B. 478, 2023–2024 Leg. § 1(b) (Cal. 2023).
[39] 15 U.S.C. § 45(a).
[40] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.
[41] *Id.* ¶ 11.

price" that included the fee.[42] The dealership thereby "charge[d] consumers higher sales prices than advertised"[43] in violation of Section 5(a).[44]

50.    The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[45]

51.    In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically.[46]

### III.    Fiverr's platform dishonestly baits consumers using drip pricing.

52.    Fiverr's marketing lures in potential customers using drip pricing.

53.    Fiverr is an online platform that offers freelancing services to consumers.

54.    Like other businesses—such as Door Dash, Lyft, or Airbnb—that connect consumers to service providers, Fiverr's platform connects freelancers with consumers who need freelancing services.

---

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.

[45] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.

[46] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066 (Jan. 10, 2025).

55.     For example, the founder of a hiking club who wanted a logo for the club could go on Fiverr's website and see an offer for logo creation priced at $40:



56.     That price is not available to any consumer.

57.     Fiverr's platform prominently displays the qualifications, accomplishments, and consumer reviews of each freelancer, so that consumers are likely to invest considerable time researching and selecting the freelancer of their choice before clicking "Continue":





What people loved about this freelancer                    See all reviews

58.    Beneath this material, the $40 purchase price is advertised again under the heading "About this gig":

## About this gig

Hi,

Do you need a **Quality Logo Creation** in Just 12 hours?
If yes, stop looking for other gigs because, in this high-quality logo creation gig, we design **modern, flat, unique, professional, Minimalist Luxury,** and **Creative Business Logo**.

With **4,000+ projects** completed, we are the perfect choice to deliver **2 modern Logo Design concepts for your business in 12 hours for just $40 with unlimited revisions.**

59.    Clicking the "Continue" button pictured above leads to another screen twice listing a $40 price:

13



60.    The $40 price is listed *again* on this page's "Continue" button:



61.    So much for the bait. Now the switch.

62.    Only now—after seeing a $40 price listed no fewer than *five times*, and likely after investing significant time in selecting the freelancer and service of her choice—is the full price of the transaction revealed to the consumer:



63.     A junk "service fee" of $5.20, amounting to 13 percent of the listed $40 price, has been added to the consumer's total at the final step of the transaction.

## IV.     Plaintiffs are victims of Fiverr's deceptive drip pricing practices.

64.     Plaintiff Andrew Miller purchased freelance services on Fiverr's platform on January 6, 2025.

65.     Miller sought website development services.

66.     After investing significant time selecting the freelancer and service of his choice, Miller selected a service listed at $80.

67.     After completing the steps described above, Miller was confronted with a junk $5.75 "service fee," amounting to 7 percent of the listed price.

68.    Having already committed to it, Miller completed the transaction and paid $85.75 total, including the $5.75 junk fee:



69.    Miller believed that the initially listed $80 price would be the actual price he would pay. In other words, Miller believed the $80 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

70.    Miller relied on the listed $80 price in comparing the service he purchased to other available services, and in his initial purchasing decision.

71.    Because Fiverr's junk fee is variable and disclosed at the last step of the transaction, Miller was unable to compare the costs of using Fiverr's platform with the costs of using other platforms or service providers.

72.    Miller would have made a different decision had he known that the price was in fact $85.75, rather than the listed $80 price.

73.     Miller intends to use Fiverr to purchase other freelancing services in the future.

74.     Plaintiff Jonathan Hageman purchased freelancing services on Fiverr's platform on December 31, 2024.

75.     Hageman sought Bible study outlines and other devotional materials.

76.     After investing significant time selecting the freelancer and service of his choice, Hageman selected a service listed at $35.

77.     After completing the steps described above, Hageman was confronted with a junk $4.93 "service fee," amounting to 14% of the listed price.

78.     Having already decided to purchase the service, Hageman completed the transaction and paid $39.93 total, including the $4.93 junk fee:



December 31, 2024 - Order #FO319C54A9B85

✓   prepare bible study outlines and        $35
    devotional ebooks
    2 Revisions

Service Fee                                  $4.93

Total paid                                   $39.93
Delivery Date                    January 14, 2025

79.     Hageman believed that the initially listed $35 price would be the actual price he would pay. In other words, Hageman believed the $35 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

80.     Hageman relied on the listed $35 price in comparing the services he purchased to other available services, and in his initial purchasing decision. Hageman would have purchased a different service on Fiverr or no services at all had he known that the price was in fact $39.93, rather than the listed $35 price.

81.     Hageman intends to use Fiverr to purchase other freelancing services in the future.

82.     Plaintiff Marcus Johnson purchased freelance services on Fiverr's platform on August 1, 2024.

83.     Johnson sought designs for a book cover and a cartoon mascot.

84.     After investing significant time selecting the freelancer and service of his choice, Johnson selected a service listed at $35.

85.     After completing the steps described above, Johnson was confronted with a junk $4.93 "service fee," amounting to 14% of the listed price.

86.     Having already decided to purchase the service, Johnson completed the transaction and paid $39.93 total, including the $4.93 junk fee:



87. Johnson believed that the initially listed $35 price would be the actual price he would pay. In other words, Johnson believed the $35 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

88. Johnson relied on the listed $35 price in comparing the services he purchased to other available services, and in his initial purchasing decision. Johnson would have purchased a different service on Fiverr or no services at all had he known that the price was in fact $39.93, rather than the listed $35 price.

89. Johnson intends to use Fiverr to purchase other freelancing services in the future.

## CLASS ALLEGATIONS

90.     Plaintiffs bring these actions under Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated.

91.     Subject to future amendment or revision, Plaintiffs seek to represent the following putative class ("Nationwide Class"):

> All United States residents who purchased freelancing services on Fiverr's platform any time between the day a class certification order is entered in these actions and the first day within the applicable limitations period, measured from April 1, 2025.

92.     Subject to future amendment or revision, Plaintiffs also seek to represent the following putative subclass ("California Subclass") of the Nationwide Class:

> All California residents who purchased freelancing services on Fiverr's platform on or after July 1, 2024.

93.     Excluded from the Nationwide Class and California Subclass are Defendants' officers, directors, and employees; Defendants' parents, subsidiaries, affiliates, and any entity in which Defendants have a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom these actions may be assigned, as well as their immediate family members.

94.     While Plaintiffs do not know the exact size of the Class and Subclass, due to the nature of the trade and commerce involved, Plaintiffs reasonably believe that Class and Subclass members are so numerous that joinder of all of them is impracticable, as Plaintiffs estimate they number in the thousands.

95.     There are questions of law and fact common to the Nationwide Class and California Subclass, including without limitation (a) whether Defendant has charged hidden junk fees through drip pricing; (b) whether Defendant's conduct violates the General Business Law, the Honest

Pricing Law, or the FTC Act; (c) whether Defendant's conduct was unfair or objectively misleading; (d) whether Defendant has been unjustly enriched by its violation of Plaintiffs' rights; and (e) whether Defendant should be enjoined from charging hidden junk fees through drip pricing.

96.     Plaintiffs' claims are typical of the Nationwide Class's and California Subclass's claims. Plaintiffs and Nationwide Class and California Subclass members share the same state and federal rights, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

97.     Plaintiffs will fairly and adequately protect the Nationwide Class's and California Subclass's interests, as Plaintiffs share their interest in avoiding illegal drip pricing; have no interest adverse to them; have retained competent counsel experienced in consumer protection and class action litigation; and intend to prosecute these actions vigorously.

98.     By charging hidden junk fees through drip pricing on each transaction, Defendant has acted on grounds that apply generally to Plaintiffs and the Nationwide Class and California Subclass, making final injunctive relief appropriate with respect to the Class and Subclass as a whole.

99.     The questions of law and fact common to Plaintiffs and the Nationwide Class and California Subclass predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

100.     A class action is superior to other available methods for adjudicating this controversy because it will permit a large number of Class and Subclass members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense required by hundreds, or thousands, of individual

actions. Class action treatment will permit adjudication of relatively modest claims by Class and Subclass members, who could not individually afford to litigate their claims against Defendants.

## CLAIMS TO RELIEF

### COUNT I
**Violation of the N.Y. General Business Law §§ 349–350**
**By all Plaintiffs on behalf of the Nationwide Class**

101.    Plaintiffs reallege paragraphs 1–89 above.

102.    Defendant's drip pricing was consumer-oriented.

103.    Defendant's drip pricing was materially deceptive and misleading. Defendant's drip pricing was likely to mislead a reasonable consumer acting reasonably under the circumstances into believing that freelancing services could be purchased on Defendant's platform for the prices Defendant advertises. Defendant's drip pricing advertises freelancing services at one price but charges consumers a different, higher price. The services advertised on Defendant's platform can only be purchased for a price higher than the one Defendant advertises. Defendant thus charges consumers higher prices than it advertises.

104.    Plaintiffs have been injured as a result of Defendant's drip pricing. Among other things, as a result of Defendant's drip pricing, Plaintiffs (1) were lured into using Defendant's platform by misleadingly low advertised prices; (2) were deprived of their ability to compare prices among freelancers on Defendant's platform, and between freelancers on Defendant's platform and other service providers; (3) were made to invest time and effort into selecting and finalizing a purchase without knowing how much the purchase would cost; and (4) faced higher prices on Defendant's platform and from other sellers than they would have absent Defendant's drip pricing, because honest sellers cannot fairly compete with Defendant's misleadingly low prices and because Defendant's deceptive drip pricing stifles competition on mandatory fees.

105.    For Defendant's violation of the General Business Law, Plaintiffs seek an injunction against Defendant's illegal drip pricing, as well as actual damages or $50, whichever is greater, trebled.

106.    Defendant's drip pricing was a willful or knowing violation of the General Business Law because it was the result of intentional design choices intended to bait consumers.

## COUNT II
### Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784
### By all Plaintiffs on behalf of the California Subclass

107.    Plaintiffs reallege paragraphs 1–89 above.

108.    Plaintiffs are "consumers" as defined by Cal. Civ. Code § 1761(d).

109.    Defendant engages in "transactions" on its platform within the meaning of Cal. Civ. Code § 1761(e) that are intended to result and do result in the sale or lease of "goods" and "services" within the meaning of Cal. Civ. Code § 1761(a)–(b).

110.    Cal. Civ. Code § 1770(a)(29)(A) prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than "[t]axes or fees imposed by a government on the transaction" or "[p]ostage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

111.    Defendant violated Cal. Civ. Code § 1770(a)(29)(A) by omitting its junk "service fees" from the prices listed on its platform until the last step of the transaction.

112.    Defendant's omission of the junk fees from its marketing was a knowing and intentional act for the purpose of luring Plaintiffs to use its platform.

113.    As a result of Defendant's violation, Plaintiffs suffered damage by spending time and money they would not have spent but for Defendant's misleading drip pricing.

114.    For Defendant's violation of the Consumers Legal Remedies Act, Plaintiffs seek an injunction against Defendant's illegal drip pricing as well as damages.

23

115.   On April 1, 2025, in accordance with Cal. Civ. Code § 1782(a), Plaintiffs sent to Defendant's principal place of business by certified mail, return receipt requested, a notice of the violations alleged in this Complaint and a demand that Defendant correct and rectify its services accordingly, as well as notice by email to legal@fiverr.com. Delivery at Defendant's address was not accepted and no response to Plaintiffs' email has been received.

**COUNT III**
**Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17606**
**By all Plaintiffs on behalf of the California Subclass**

116.   Plaintiffs reallege paragraphs 1–89 above.

117.   Section 17500 of the California Business and Professions Code provides that it is unlawful to make, disseminate, or cause the dissemination of advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

118.   Defendant violated Cal. Bus. & Prof. Code § 17500 by misleadingly advertising an upfront price that was lower than the total price—including hidden monthly junk fees—it would ultimately charge.

119.   As a result of Defendant's violation, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendant's misleading drip pricing.

120.   For Defendant's violation of the False Advertising Law, Plaintiffs seek an injunction against Defendants' illegal drip pricing, as well as restitution.

**COUNT IV**
**Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210**
**By all Plaintiffs on behalf of the California Subclass**

121.   Plaintiffs reallege paragraphs 1–89 above.

122.    Plaintiffs and Defendant are each "persons" under Cal. Bus. & Prof. Code § 17201.

123.    Cal. Bus. & Prof. Code § 17200 prohibits unfair competition by means of "any unlawful, unfair or fraudulent business act or practice," including by violations of the False Advertising Law.

124.    Defendant violated Cal. Bus. & Prof. Code § 17200 by (a) unlawfully engaging in drip pricing, in violation of the Consumers Legal Remedies Act, the False Advertising Law, and Section 5(a) of the FTC Act; (b) unfairly engaging in unethical bait and switch advertising that injures consumers and benefits no one but Defendants, and violates the legislatively declared policy of price transparency; and (c) fraudulently advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

125.    As a result of Defendant's violation, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendants' misleading drip pricing.

126.    For Defendant's violation of the Unfair Competition Law, Plaintiffs seek an injunction against Defendants' illegal drip pricing, as well as restitution.

### COUNT V
### Unjust Enrichment, New York and California Common Law
### By all Plaintiffs on behalf of the Nationwide Class and California Subclass

127.    Plaintiffs reallege paragraphs 1–89 above.

128.    Plaintiffs conferred a monetary benefit on Defendant in the form of mandatory hidden junk fees paid to Defendant.

129.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs through payment of the hidden junk fees.

130.    Defendant has unjustly retained the benefits that Plaintiffs conferred on it because Defendant procured the benefits through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

131.    The benefits that Defendant derived from Plaintiffs rightly belong to Plaintiffs, and Defendant should be compelled to disgorge the wrongfully obtained fees it received as a result of its inequitable conduct.

## PRAYER FOR RELIEF

132.    Plaintiffs ask the Court to

a.      Certify these actions as class actions under Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

b.      Enter a final judgment in Plaintiffs' and the Nationwide Class's and California Subclass's favor that

        i.      Permanently enjoins Defendant from the unlawful conduct alleged in this Complaint,

        ii.     Awards treble actual or statutory damages to Plaintiffs and the Nationwide Class, according to proof;

        iii.    Awards restitution and actual damages to Plaintiffs and the California Subclass, according to proof, and

        iv.     Awards pre- and postjudgment interest, as allowed by law;

c.      Award Plaintiffs and their counsel their reasonable costs and fees incurred in prosecuting these actions, as allowed by law; and

d.      Order such further relief as the Court deems appropriate.

## JURY DEMAND

133.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: DATE

Respectfully submitted,

/s/ SIGNATURE

Lynn A. Toops*
Vess A. Miller*
Natalie A. Lyons**
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
vmiller@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
**STRANCH, JENNINGS &
GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

Samuel J. Strauss**
Raina C. Borrelli*
Andrew G. Gunem**
Carly M. Roman**
**STRAUSS BORRELLI, LLP**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com
raina@straussborrelli.com
agunem@straussborrelli.com
croman@straussborrelli.com

James Jackson Bilsborrow
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Tel.: (212) 558-5500
jbilsborrow@weitzlux.com

27

*Attorneys for Plaintiffs*
* Admitted *pro hac vice*
** Application for admission *pro hac vice* forthcoming

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW MILLER and JONATHAN HAGEMAN, on behalf of ~~himself~~themselves and all others similarly situated, <br><br> ~~Plaintiff~~Plaintiffs, <br><br> vs. <br><br> FIVERR, INC., <br><br> Defendant. | Case No.: 1:25-cv-02684-NRB |
| MARCUS JOHNSON, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> FIVERR, INC., <br><br> Defendant. | Case No. 1:25-cv-05079-NRB |

## AMENDED CONSOLIDATED COMPLAINT

Plaintiffs Andrew Miller, Jonathan Hageman, and Marcus Johnson, on behalf of themselves

and all others similarly situated, complain of Defendant Fiverr, Inc., as follows, on information

and belief except as to their own experiences and matters of public record:

### INTRODUCTION

1.     This amended complaint consolidates for administrative purposes only the claims

of Plaintiff Andrew Miller in *Miller v. Fiverr, Inc.*, No. 1:25-cv-02684-NRB, and the claims of

Plaintiff Marcus Johnson in *Johnson v. Fiverr, Inc.*, No. 1:25-cv-05079-NRB. *See* ECF No. 25.

These cases are not merged and retain their separate identities. *See Hall v. Hall*, 584 U.S. 59, 76–

1

77 (2018). This complaint also joins Plaintiff Jonathan Hageman to *Miller v. Fiverr, Inc.*, No. 1:25-cv-02684-NRB.

2.      "When shopping for a good or service, consumers want to know: how much?"[1]

3.      "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[2]

4.      One such unfair and deceptive practice is called "drip pricing."

5.      "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

6.      Drip pricing is a form of dishonest bait-and-switch advertising.

7.      For this reason, it is prohibited by New York, California, and federal consumer protection law.

8.      Fiverr, the owner and operator of an online freelancing platform, does just what the law prohibits. Over and over again, it lists one upfront price to entice consumers into making a purchasing decision, only to pull the rug out from under their feet at the last stage of the transaction by adding hidden, mandatory junk fees when consumers have already decided to complete the transaction in reliance on the upfront price.

9.      Plaintiffs Andrew Miller, Jonathan Hageman, and Marcus Johnson purchased certain services on Fiverr, the price of which was misleadingly and unlawfully advertised as lower than the total prices Plaintiffs would pay after Fiverr smuggled in its junk fees just as they were completing the transactions.

---

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] *Id.*

10.     On their own behalf and on behalf of all other similarly injured consumers, Plaintiffs bring these actions to put a stop to Fiverr's illegal business practices and to remedy the injuries they have caused.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction of these actions under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this Court as to both actions under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District; under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and, as to the *Johnson* action, under § 28 U.S.C. § 1404(a), because all parties have consented to venue in this District.

## PARTIES

13.     Plaintiff Andrew Miller is a resident of Oakland, California.

14.     Plaintiff Jonathan Hageman is a resident of Riverside, California.

14.15.  Plaintiff Marcus Johnson is a resident of Oakland, California.

15.16.  Defendant Fiverr, Inc. is a corporation incorporated in Delaware with its principal place of business at 38 Greene St., New York, NY 10013.

3

## FACTUAL ALLEGATIONS

### I.    Drip pricing harms consumers.

16.17.  "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[3] Hidden fees are a kind of "junk fees."[4] Such fees are "mandatory but not transparently disclosed to consumers."[5] Consumers may be "lured in with the promise of a low price, but when they get to the register, they discover that price was never really available."[6] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[7]

17.18.  The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[8] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[9] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[10]

18.19.  As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[11]

---

[3] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14 .2022%20-%20FINAL.pdf/.

[4] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").

[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

[6] *Id.*

[7] *Id.* n.2.

[8] *Bringing Dark Patterns to Light*, *supra* note 3, at 8–9.

[9] *Id.* at 8.

[10] *Id.* at 9.

[11] *Id.* at 23, 30.



19.20.  Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[12] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[13]

20.21.  "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase, "abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[14]

---

[12] *Id.* at 9.
[13] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_archit ecture_discussion_paper.pdf/.
[14] *Id.* at 30.

21.22.  In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[15]

22.23.  Drip pricing harms consumers.

23.24.  "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[16]

24.25.  "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[17]

25.26.  As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous and makes it extremely difficult for consumers to make informed decisions."[18]

26.27.  As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert, fly home to see a sick loved one—that's just not fair."[19]

---

[15] *Id.*
[16] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.
[17] *Online Choice Architecture*, *supra* note 13, at 30.
[18] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[19] *Id.*

27.28.  "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[20]

28.29.  According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[21]

29.30.  Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[22]

30.31.  Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[23]

31.32.  Drip pricing harms honest businesses too.

32.33.  An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[24]

33.34.  Drip pricing thereby harms free and fair competition.

34.35.  "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on

---

[20] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.
[21] *Id*.
[22] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.
[23] *Online Choice Architecture*, *supra* note 13, at 30.
[24] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.

less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[25]

35.36.  One study found that sellers "set the highest possible drip price, and compete only on base prices."[26]

36.37.  For this reason, drip pricing is difficult or impossible to correct using only market pressures.[27]

37.38.  The law must intervene.[28]

**II.    State and federal consumer protection laws protect consumers against drip pricing.**

38.39.  New York law prohibits "[d]eceptive acts or practices in the conduct of any business,"[29] including "[f]alse advertising."[30]

39.40.  For more than 65 years, New York has held bait-and-switch schemes like drip pricing to be "deceptive and harmful to the public interest."[31]

40.41.  More recently, the sponsor of a bill regulating event ticket sales, which, among other things, prohibited drip pricing, noted the bill incorporated recommendations generated by a legislative investigation into the ticketing industry "due to concerns about potentially unfair, deceptive, and anti-consumer practices."[32]

41.42.  California law likewise prohibits drip advertising.

---

[25] *Online Choice Architecture*, *supra* note 13, at 30.

[26] *Drip Pricing and Its Regulation*, *supra* note 22.

[27] *See id.* at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").

[28] *See id.* (discussing regulatory interventions).

[29] N.Y. Gen. Bus. Law § 349(a).

[30] *Id.* § 350.

[31] *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 204 (N.Y. 1959).

[32] S.B. 9461-244, Sponsors Mem. (N.Y. 2022). The enacted bill amended several sections of the New York Arts and Cultural Affairs Law. *See* 2022 N.Y. Sess. Laws ch. 358 (McKinney). The drip pricing provision is codified at N.Y. Arts & Cult. Aff. § 25.07(4).

42.43.  "[T]he price a Californian sees should be the price they pay."[33] This straightforward, commonsense proposition underlies California Senate Bill 478, effective July 1, 2024, codified at Cal. Civ. Code § 1770(a)(29), called the "Honest Pricing Law" or "Hidden Fees Statute."

43.44.  The Honest Pricing Law was enacted to suppress the dishonest bait-and-switch of drip pricing. The Legislature declared that SB 478 is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service,"[34] and identified drip pricing as a form of "bait and switch advertising."[35]

44.45.  As the California Attorney General has summarized succinctly, "The law requires honest pricing. It prohibits businesses from '[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges' other than government-imposed taxes or fees or reasonable shipping costs."[36]

45.46.  "Honest pricing" means not just that junk fees are disclosed at some point in the transaction. "Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction? No. The advertised or listed price must be the full price that the consumer is required to pay. … If a business chooses to list a price for a good or service, the

---

[33] Cal. Dep't of Justice Off. of the Att'y Gen., *SB 478 Frequently Asked Questions* 1 (emphasis omitted), https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf/ (last accessed DATE).September 19, 2025).

[34] S.B. 478, 2023–2024 Leg. § 1(a) (Cal. 2023).

[35] *Id.* § 1(b).

[36] Cal. Dep't of Justice Off. of the Att'y Gen., *supra* note 33, at 1 (quoting Cal. Civ. Code § 1770(a)(29)(A)).

advertised price must be the entire amount the consumer will have to pay, not including any fees for optional services or features, taxes, or shipping charges."[37]

46.47.   Further, "like other forms of bait and switch advertising," drip pricing is "prohibited by existing [California] statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)."[38]

47.48.   Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[39]

48.49.   The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[40] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[41] Consumers would invariably find that the advertised car could "only be purchased for a higher

---

[37] *Id*. at 2–3.
[38] S.B. 478, 2023–2024 Leg. § 1(b) (Cal. 2023).
[39] 15 U.S.C. § 45(a).
[40] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.
[41] *Id.* ¶ 11.

price" that included the fee.[42] The dealership thereby "charge[d] consumers higher sales prices than advertised"[43] in violation of Section 5(a).[44]

49.50.  The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[45]

50.51.  In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically.[46]

## III.   Fiverr's platform dishonestly baits consumers using drip pricing.

51.52.  Fiverr's marketing lures in potential customers using drip pricing.

52.53.  Fiverr is an online platform that offers freelancing services to consumers.

53.54.  Like other businesses—such as Door Dash, Lyft, or Airbnb—that connect consumers to service providers, Fiverr's platform connects freelancers with consumers who need freelancing services.

---

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.

[45] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.

[46] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066 (Jan. 10, 2025).

54.55.  For example, the founder of a hiking club who wanted a logo for the club could go on Fiverr's website and see an offer for logo creation priced at $40:



55.56.  That price is not available to any consumer.

56.57.  Fiverr's platform prominently displays the qualifications, accomplishments, and consumer reviews of each freelancer, so that consumers are likely to invest considerable time researching and selecting the freelancer of their choice before clicking "Continue":





57.58.  Beneath this material, the $40 purchase price is advertised again under the heading "About this gig":

## About this gig

Hi,

Do you need a **Quality Logo Creation** in just 12 hours?
If yes, stop looking for other gigs because, in this high-quality logo creation gig, we design **modern, flat, unique, professional, Minimalist Luxury,** and **Creative Business Logo**.

With **4,000+ projects** completed, we are the perfect choice to deliver **2 modern Logo Design concepts for your business in 12 hours for just $40 with unlimited revisions**.

58.59.  Clicking the "Continue" button pictured above leads to another screen twice listing a $40 price:



59.60.  The $40 price is listed *again* on this page's "Continue" button:



60.61.  So much for the bait. Now the switch.

61.62.  Only now—after seeing a $40 price listed no fewer than *five times*, and likely after investing significant time in selecting the freelancer and service of her choice—is the full price of the transaction revealed to the consumer:



62.63.  A junk "service fee" of $5.20, amounting to 13 percent of the listed $40 price, has been added to the consumer's total at the final step of the transaction.

## IV.    Plaintiffs are victims of Fiverr's deceptive drip pricing practices.

63.64.  Plaintiff Andrew Miller purchased freelance services on Fiverr's platform on January 6, 2025.

64.65.  Miller sought website development services.

65.66.  After investing significant time selecting the freelancer and service of his choice, Miller selected a service listed at $80.

66.67.  After completing the steps described above, Miller was confronted with a junk $5.75 "service fee," amounting to 7 percent of the listed price.

67.68. Having already committed to it, Miller completed the transaction and paid $85.75 total, including the $5.75 junk fee:



68.69. Miller believed that the initially listed $80 price would be the actual price he would pay. In other words, Miller believed the $80 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

69.70. Miller relied on the listed $80 price in comparing the service he purchased to other available services, and in his initial purchasing decision.

70.71. Because Fiverr's junk fee is variable and disclosed at the last step of the transaction, Miller was unable to compare the costs of using Fiverr's platform with the costs of using other platforms or service providers.

71.72. Miller would have made a different decision had he known that the price was in fact $85.75, rather than the listed $80 price.

16

72.73.  Miller intends to use Fiverr to purchase other freelancing services in the future.

74.    Plaintiff Jonathan Hageman purchased freelancing services on Fiverr's platform on December 31, 2024.

75.    Hageman sought Bible study outlines and other devotional materials.

76.    After investing significant time selecting the freelancer and service of his choice, Hageman selected a service listed at $35.

77.    After completing the steps described above, Hageman was confronted with a junk $4.93 "service fee," amounting to 14% of the listed price.

78.    Having already decided to purchase the service, Hageman completed the transaction and paid $39.93 total, including the $4.93 junk fee:

### December 31, 2024 - Order #FO319C54A9B85

✓ prepare bible study outlines and devotional ebooks     $35

2 Revisions

| | |
|---|---|
| Service Fee | $4.93 |
| Total paid | $39.93 |
| Delivery Date | January 14, 2025 |

79.    Hageman believed that the initially listed $35 price would be the actual price he would pay. In other words, Hageman believed the $35 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

80.     Hageman relied on the listed $35 price in comparing the services he purchased to other available services, and in his initial purchasing decision. Hageman would have purchased a different service on Fiverr or no services at all had he known that the price was in fact $39.93, rather than the listed $35 price.

81.     Hageman intends to use Fiverr to purchase other freelancing services in the future.

~~73.~~82.  Plaintiff Marcus Johnson purchased freelance services on Fiverr's platform on August 1, 2024.

~~74.~~83.  Johnson sought designs for a book cover and a cartoon mascot.

~~75.~~84.  After investing significant time selecting the freelancer and service of his choice, Johnson selected a service listed at $35.

~~76.~~85.  After completing the steps described above, Johnson was confronted with a junk $4.93 "service fee," amounting to 14% of the listed price.

~~77.~~86.  Having already decided to purchase the service, Johnson completed the transaction and paid $39.93 total, including the $4.93 junk fee:



78.87.  Johnson believed that the initially listed $35 price would be the actual price he would pay. In other words, Johnson believed the $35 price included all mandatory fees (excluding taxes and shipping charges, which did not apply here).

79.88.  Johnson relied on the listed $35 price in comparing the services he purchased to other available services, and in his initial purchasing decision. Johnson would have purchased a different service on Fiverr or no services at all had he known that the price was in fact $39.93, rather than the listed $35 price.

80.89.  Johnson intends to use Fiverr to purchase other freelancing services in the future.

## CLASS ALLEGATIONS

~~81.~~90.  Plaintiffs bring these actions under Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated.

~~82.~~91.  Subject to future amendment or revision, Plaintiffs seek to represent the following putative class ("Nationwide Class"):

> All United States residents who purchased freelancing services on Fiverr's platform any time between the day a class certification order is entered in these actions and the first day within the applicable limitations period, measured from April 1, 2025.

~~83.~~92.  Subject to future amendment or revision, Plaintiffs also seek to represent the following putative subclass ("California Subclass") of the Nationwide Class:

> All California residents who purchased freelancing services on Fiverr's platform on or after July 1, 2024.

~~84.~~93.  Excluded from the Nationwide Class and California Subclass are Defendants' officers, directors, and employees; Defendants' parents, subsidiaries, affiliates, and any entity in which Defendants have a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom these actions may be assigned, as well as their immediate family members.

~~85.~~94.  While Plaintiffs do not know the exact size of the Class and Subclass, due to the nature of the trade and commerce involved, Plaintiffs reasonably believe that Class and Subclass members are so numerous that joinder of all of them is impracticable, as Plaintiffs estimate they number in the thousands.

~~86.~~95.  There are questions of law and fact common to the Nationwide Class and California Subclass, including without limitation (a) whether Defendant has charged hidden junk fees through drip pricing; (b) whether Defendant's conduct violates the General Business Law, the Honest

Pricing Law, or the FTC Act; (c) whether Defendant's conduct was unfair or objectively misleading; (d) whether Defendant has been unjustly enriched by its violation of Plaintiffs' rights; and (e) whether Defendant should be enjoined from charging hidden junk fees through drip pricing.

87.96.  Plaintiffs' claims are typical of the Nationwide Class's and California Subclass's claims. Plaintiffs and Nationwide Class and California Subclass members share the same state and federal rights, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

88.97.  Plaintiffs will fairly and adequately protect the Nationwide Class's and California Subclass's interests, as Plaintiffs share their interest in avoiding illegal drip pricing; have no interest adverse to them; have retained competent counsel experienced in consumer protection and class action litigation; and intend to prosecute these actions vigorously.

89.98.  By charging hidden junk fees through drip pricing on each transaction, Defendant has acted on grounds that apply generally to Plaintiffs and the Nationwide Class and California Subclass, making final injunctive relief appropriate with respect to the Class and Subclass as a whole.

90.99.  The questions of law and fact common to Plaintiffs and the Nationwide Class and California Subclass predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

91.100.  A class action is superior to other available methods for adjudicating this controversy because it will permit a large number of Class and Subclass members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense required by hundreds, or thousands, of individual

actions. Class action treatment will permit adjudication of relatively modest claims by Class and

Subclass members, who could not individually afford to litigate their claims against Defendants.

### CLAIMS TO RELIEF

### COUNT I
### Violation of the N.Y. General Business Law §§ 349–350
### On By all Plaintiffs on behalf of the Nationwide Class

92. 101.          Plaintiffs reallege paragraphs 1–80 89 above.

93. 102.          Defendant's drip pricing was consumer-oriented.

94. 103.          Defendant's drip pricing was materially deceptive and misleading.
Defendant's drip pricing was likely to mislead a reasonable consumer acting reasonably under the
circumstances into believing that freelancing services could be purchased on Defendant's platform
for the prices Defendant advertises. Defendant's drip pricing advertises freelancing services at one
price but charges consumers a different, higher price. The services advertised on Defendant's
platform can only be purchased for a price higher than the one Defendant advertises. Defendant
thus charges consumers higher prices than it advertises.

95. 104.          Plaintiffs have been injured as a result of Defendant's drip pricing. Among
other things, as a result of Defendant's drip pricing, Plaintiffs (1) were lured into using Defendant's
platform by misleadingly low advertised prices; (2) were deprived of their ability to compare prices
among freelancers on Defendant's platform, and between freelancers on Defendant's platform and
other service providers; (3) were made to invest time and effort into selecting and finalizing a
purchase without knowing how much the purchase would cost; and (4) faced higher prices on
Defendant's platform and from other sellers than they would have absent Defendant's drip pricing,
because honest sellers cannot fairly compete with Defendant's misleadingly low prices and
because Defendant's deceptive drip pricing stifles competition on mandatory fees.

22

96.105.　　　For Defendant's violation of the General Business Law, Plaintiffs seek an injunction against Defendant's illegal drip pricing, as well as actual damages or $50, whichever is greater, trebled.

97.106.　　　Defendant's drip pricing was a willful or knowing violation of the General Business Law because it was the result of intentional design choices intended to bait consumers.

## COUNT II
### Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784
### OnBy all Plaintiffs on behalf of the California Subclass

98.107.　　　Plaintiffs reallege paragraphs 1–8089 above.

99.108.　　　Plaintiffs are "consumers" as defined by Cal. Civ. Code § 1761(d).

100.109.　　　Defendant engages in "transactions" on its platform within the meaning of Cal. Civ. Code § 1761(e) that are intended to result and do result in the sale or lease of "goods" and "services" within the meaning of Cal. Civ. Code § 1761(a)–(b).

101.110.　　　Cal. Civ. Code § 7701770(a)(29)(A) prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than "[t]axes or fees imposed by a government on the transaction" or "[p]ostage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

102.111.　　　Defendant violated Cal. Civ. Code § 1770(a)(29)(A) by omitting its junk "service fees" from the prices listed on its platform until the last step of the transaction.

103.112.　　　Defendant's omission of the junk fees from its marketing was a knowing and intentional act for the purpose of luring Plaintiffs to use its platform.

104.113.　　　As a result of Defendant's violation, Plaintiffs suffered damage by spending time and money they would not have spent but for Defendant's misleading drip pricing.

105.114.　　　For Defendant's violation of the Consumers Legal Remedies Act, Plaintiffs seek an injunction against Defendant's illegal drip pricing as well as damages.

106.115.    On April 1, 2025, in accordance with Cal. Civ. Code § 1782(a), Plaintiffs sent to Defendant's principal place of business by certified mail, return receipt requested, a notice of the violations alleged in this Complaint and a demand that Defendant correct and rectify its services accordingly, as well as notice by email to legal@fiverr.com. Delivery at Defendant's address was not accepted and no response to Plaintiffs' email has been received.

**COUNT III**
**Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17606**
~~On~~**By all Plaintiffs on** behalf of the California Subclass

107.116.    Plaintiffs reallege paragraphs 1–~~80~~89 above.

108.117.    Section 17500 of the California Business and Professions Code provides that it is unlawful to make, disseminate, or cause the dissemination of advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

109.118.    Defendant violated Cal. Bus. & Prof. Code § 17500 by misleadingly advertising an upfront price that was lower than the total price—including hidden monthly junk fees—it would ultimately charge.

110.119.    As a result of Defendant's violation, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendant's misleading drip pricing.

111.120.    For Defendant's violation of the False Advertising Law, Plaintiffs seek an injunction against Defendants' illegal drip pricing, as well as restitution.

**COUNT IV**
**Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210**
~~On~~**By all Plaintiffs on** behalf of the California Subclass

112.121.    Plaintiffs reallege paragraphs 1–~~80~~89 above.

113.122.    Plaintiffs and Defendant are each "persons" under Cal. Bus. & Prof. Code § 17201.

114.123.    Cal. Bus. & Prof. Code § 17200 prohibits unfair competition by means of "any unlawful, unfair or fraudulent business act or practice," including by violations of the False Advertising Law.

115.124.    Defendant violated Cal. Bus. & Prof. Code § 17200 by (a) unlawfully engaging in drip pricing, in violation of the Consumers Legal Remedies Act, the False Advertising Law, and Section 5(a) of the FTC Act; (b) unfairly engaging in unethical bait and switch advertising that injures consumers and benefits no one but Defendants, and violates the legislatively declared policy of price transparency; and (c) fraudulently advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

116.125.    As a result of Defendant's violation, Plaintiffs have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendants' misleading drip pricing.

117.126.    For Defendant's violation of the Unfair Competition Law, Plaintiffs seek an injunction against Defendants' illegal drip pricing, as well as restitution.

### COUNT V
**Unjust Enrichment, New York and California Common Law**
**OnBy all Plaintiffs on behalf of the Nationwide Class and California Subclass**

118.127.    Plaintiffs reallege paragraphs 1–8089 above.

119.128.    Plaintiffs conferred a monetary benefit on Defendant in the form of mandatory hidden junk fees paid to Defendant.

120.129.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs through payment of the hidden junk fees.

121.130.    Defendant has unjustly retained the benefits that Plaintiffs conferred on it because Defendant procured the benefits through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

122.131.    The benefits that Defendant derived from Plaintiffs rightly belong to Plaintiffs, and Defendant should be compelled to disgorge the wrongfully obtained fees it received as a result of its inequitable conduct.

## PRAYER FOR RELIEF

123.132.    Plaintiffs ask the Court to

a.    Certify these actions as class actions under Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

b.    Enter a final judgment in Plaintiffs' and the Nationwide Class's and California Subclass's favor that

   i.    Permanently enjoins Defendant from the unlawful conduct alleged in this Complaint,

   ii.   Awards treble actual or statutory damages to Plaintiffs and the Nationwide Class, according to proof;

   iii.  Awards restitution and actual damages to Plaintiffs and the California Subclass, according to proof, and

   iv.   Awards pre- and postjudgment interest, as allowed by law;

c.    Award Plaintiffs and their counsel their reasonable costs and fees incurred in prosecuting these actions, as allowed by law; and

d.    Order such further relief as the Court deems appropriate.

# JURY DEMAND

124.133.    Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 8, 2025DATE                    Respectfully submitted,

                                                /s/ *Lynn A. Toops*SIGNATURE
                                                Lynn A. Toops*
                                                Vess A. Miller*
                                                Natalie A. Lyons**
                                                Ian R. Bensberg*
                                                **COHENMALAD, LLP**
                                                One Indiana Square, Suite 1400
                                                Indianapolis, IN 46204
                                                Tel.: (317) 636-6481
                                                ltoops@cohenmalad.com
                                                vmiller@cohenmalad.com
                                                nlyons@cohenmalad.com
                                                ibensberg@cohenmalad.com

                                                Gerard J. Stranch, IV*
                                                **STRANCH, JENNINGS &**
                                                **GARVEY, PLLC**
                                                223 Rosa L. Parks Avenue, Suite 200
                                                Nashville, TN 37203
                                                Tel.: (615) 254-8801
                                                gstranch@stranchlaw.com

                                                Samuel J. Strauss**
                                                Raina C. Borrelli*
                                                Andrew G. Gunem**
                                                Carly M. Roman**
                                                **STRAUSS BORRELLI, LLP**
                                                980 N. Michigan Avenue, Suite 1610
                                                Chicago, IL 60611
                                                Tel.: (872) 263-1100
                                                sam@straussborrelli.com
                                                raina@straussborrelli.com
                                                agunem@straussborrelli.com
                                                croman@straussborrelli.com

                                                James Jackson Bilsborrow
                                                **WEITZ & LUXENBERG, PC**
                                                700 Broadway
                                                New York, NY 10003
                                                Tel.: (212) 558-5500
                                                jbilsborrow@weitzlux.com

*Attorneys for Plaintiffs*
\* Admitted *pro hac vice*
\*\* Application for admission *pro hac vice* forthcoming