UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
ANDREW MILLER, MARCUS JOHNSON, and JONATHAN HAGEMAN, individually and on behalf of others similarly situated,

Plaintiffs,

- against -

FIVERR INC.,

Defendant.

--------------------------------------X

**MEMORANDUM AND ORDER**

25 Civ. 2684 (NRB)
25 Civ. 5079 (NRB)
(consolidated)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Andrew Miller, Jonathan Hageman, and Marcus Johnson bring these consolidated putative class actions against Fiverr Inc. ("Fiverr"), asserting claims arising from Fiverr's practice of disclosing a service fee during the checkout process for services purchased through its online marketplace. Specifically, plaintiffs assert claims under sections 349 and 350 of the New York General Business Law ("GBL"), California's Consumers Legal Remedies Act ("CLRA"), California's False Advertising Law ("FAL"), and California's Unfair Competition Law ("UCL"), as well as for unjust enrichment under New York and California common law. Presently before the Court is Fiverr's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Fiverr contends that: (i) the

challenged pricing practice would not mislead a reasonable consumer and, in any event, plaintiffs fail to plead reliance, causation, or resulting injury; (ii) plaintiffs' GBL claims lack the requisite nexus to New York; (iii) plaintiffs do not qualify as "consumers" under the CLRA; (iv) plaintiffs' remaining UCL and unjust enrichment theories fail on independent and derivative grounds; and (v) plaintiffs lack Article III standing. For the reasons set forth below, Fiverr's motion is granted.

**I. Materials Considered**

Before reciting the relevant background and analyzing the accompanying legal issues, the Court must first address the materials it will consider among those submitted in conjunction with Fiverr's motion. Fiverr requests that the Court take judicial notice of the ten exhibits submitted with the declarations of Ofer Katz, Fiverr's President and Chief Financial Officer, and Julian A. Lamm, counsel for Fiverr, as well as several screenshots reproduced in Fiverr's brief. ECF No. 32-1. Exhibits A through E to the declaration of Mr. Katz consist of plaintiffs' account information, order histories, and communications with freelancers concerning the transactions at issue. ECF No. 33 ("Katz Declaration"). Exhibits F through J to the declaration of Mr. Lamm consist of publicly available materials relating to

Fiverr's platform, Fiverr's July 2024 Terms of Service and Payment Terms, and an Amazon webpage titled "Affiliate Links." ECF No. 34 ("Lamm Declaration"). The additional screenshots in Fiverr's brief depict Fiverr's publicly available website and a more fulsome version of a freelancer listing reproduced in the Amended Consolidated Complaint ("ACC").

Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. A court may take judicial notice of a fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Moreover, a court "must" take judicial notice where a party requests it and supplies the court with the necessary information. Id. 201(c)(2). Separately, in resolving a motion to dismiss under Rule 12(b)(6), a court may consider the facts alleged in the pleadings, documents attached to or incorporated by reference in the pleadings, documents integral to the pleadings, and matters of which judicial notice may properly be taken. Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002). A document is integral if the complaint "relies heavily upon its terms and effect." Chambers, 282 F.3d at 153 (citation omitted).

The Court first considers Exhibits A through E. Mr. Katz states that, based on his personal knowledge and information acquired through his work as President and Chief Financial Officer for Fiverr, Fiverr maintains the records reflected in the exhibits in the ordinary course of its regularly conducted business. Katz Decl. ¶¶ 1, 3. He identifies the Fiverr account associated with each plaintiff and authenticates Exhibits A, B, and D as true copies of plaintiffs' account information and order histories and Exhibits C and E as true copies of the communications concerning Messrs. Miller's and Hageman's challenged transactions. Id. ¶¶ 4-9. Those exhibits contain contemporaneously recorded information reflecting plaintiffs' use of Fiverr's platform, including the information they supplied when registering their profiles, the dates, volume, and cost of their orders, the service fees charged, and the communications with the freelancers from whom they purchased services. Id. They are thus the primary and most direct records of the transactions and account activity that plaintiffs have placed at issue. Plaintiffs necessarily had access to their own account activity and participated in the communications shown in the exhibits.

Exhibits A through E are also integral to the ACC. The ACC places three specific Fiverr purchases, and the processes by which

plaintiffs selected and purchased the relevant services, at the center of each claim. It alleges the dates and subject matter of those transactions, the prices plaintiffs encountered, the service fees displayed, and the amounts that plaintiffs paid. ACC ¶¶ 64-89. The account histories and transaction communications memorialize those purchases and supply complete context for the portions of the purchasing process described in the ACC.

Plaintiffs object generally that Fiverr relies on extrinsic and "cherry-picked" materials, ECF No. 37 at 2, but they do not dispute the authenticity of the exhibits, identify any inaccurate entry, or offer any reason to question the accuracy of Fiverr's records. The Court sees no reason to rely on either party's characterization of plaintiffs' transactions when the records of those transactions are now before it and their accuracy is not disputed. Under these circumstances, the objective contents of Exhibits A through E can be readily determined from sources whose accuracy has not been questioned. Accordingly, the Court takes judicial notice of those contents. The Court does not, however, judicially notice every characterization or inference Fiverr advances from the records and considers what the exhibits objectively reflect, including the dates, amounts, service fees,

and profile information, and draws only those inferences appropriate on a motion to dismiss.

With respect to the remaining exhibits and screenshots, Mr. Lamm identifies Exhibit F as screenshots from Fiverr's publicly available "How Fiverr works" video; Exhibit G as an archived copy of Fiverr's July 2024 Terms of Service; Exhibit H as an archived copy of Fiverr's July 2024 Payment Terms; Exhibit I as a copy of Fiverr's "How Fiverr works" webpage; and Exhibit J as an Amazon webpage concerning affiliate links. Lamm Decl. ¶¶ 2-6. He further identifies the screenshots reproduced in Fiverr's brief as images taken from Fiverr's public website, including a more fulsome version of the freelancer listing reproduced in the ACC. Id. ¶¶ 7-8.

The ACC repeatedly describes and reproduces portions of Fiverr's website and challenges Fiverr's platform-wide purchase process. ACC ¶¶ 52-63. Fiverr's Terms of Service and Payment Terms govern that process and set forth the respective roles of Fiverr, buyers, and sellers, as well as the manner in which service fees are imposed and calculated. The authenticity or accuracy of these public materials is not disputed. The Court therefore takes judicial notice of their existence and contents and considers them together with the ACC, and Fiverr's request for judicial notice is

granted. The Court considers Exhibits A through J and the accompanying screenshots in resolving the instant motion.

## II. Factual Background[1]

Plaintiffs Andrew Miller and Marcus Johnson are residents of Oakland, California, and plaintiff Jonathan Hageman is a resident of Riverside, California. ACC ¶¶ 13-15. Defendant Fiverr Inc. is incorporated in Delaware and maintains its principal place of business in New York. Id. ¶ 16.

### a. Fiverr's Platform and Service Fees

Fiverr operates an online marketplace through which prospective buyers obtain digital services from freelancers. Katz Decl. ¶ 2. A user must sign up for an account to purchase or sell services through the platform. Id. Fiverr refers to the services offered through the platform as "Gigs," to freelancers as "Sellers," and to prospective purchasers as "Buyers." Lamm Decl., Ex. G ("Terms of Service") §§ 2, 4.1. Under Fiverr's Terms of

---

[1] Consistent with the above discussion, the following facts are drawn from the ACC, ECF No. 29, the documents incorporated into and integral to the ACC, and the materials of which the Court takes judicial notice. The Court accepts the ACC's well-pleaded factual allegations as true except where they are contradicted by the documents properly considered on this motion. See Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). Where a document relied on in the ACC contradicts the allegations contained therein, "the document . . . control[s][.]" Housey v. Procter & Gamble Co., 2022 WL 874731, at *6 (S.D.N.Y. Mar. 24, 2022) (quoting Mizel Roth IRA on Behalf of Consol. Asset Funding 3 LP v. Unified Cap. Partners 3 LLC, 2021 WL 1164439, at *1 (S.D.N.Y. Mar. 25, 2021)).

Service, Sellers create Gigs and determine their own pricing. Id. §§ 3, 4.1. Sellers may offer services at a base starting price and may also provide Buyers with individualized "Custom Offers." Id. §§ 2, 4.1. The Terms of Service provide that only registered users may purchase services and further direct Buyers to read the Payment Terms for the fees and payments associated with a purchase. Id. § 3. Fiverr's marketplace allows Buyers to browse and compare freelancers and services. The search results display information about the freelancer and the service offered, along with a price identified as "From" or "Starting at" a specific amount. Lamm Decl., Ex. F at 3-4, 45. A Buyer may then open the freelancer's Gig page, select among available packages or additional options, or communicate directly with the freelancer to obtain a Custom Offer tailored to the Buyer's requested scope of work. Terms of Service §§ 4.1, 4.6.

The Payment Terms govern payments made through the platform. They state that by making or receiving payments through Fiverr, a user agrees, individually or on behalf of an employer or other entity where applicable, to be bound by the Payment Terms. Lamm Decl., Ex. H ("Payment Terms") at 1. Fiverr acts as the Seller's limited payment collection agent, accepting payment from the Buyer and remitting the appropriate amount to the Seller. Id. § 2.1.

The Payment Terms also provide that Buyers pay service fees on Gig purchases. As of June 2024, the service fee was 5.5% of the purchase amount, with an additional $3 charge for purchases under $100. Id. § 3.1. The Payment Terms state that the service fee is added "at the time of purchase," when the Buyer "can review and accept the total amount requested[.]" Id. Before the transaction is completed, Fiverr displays the Seller's charge, the service fee, and the total amount due, after which the Buyer may "Confirm & Pay." ACC ¶ 62.

**b. Fiverr's Challenged Pricing Practice**

Plaintiffs characterize Fiverr's practice as "drip pricing," which the ACC defines as displaying one price for a good or service before adding one or more mandatory fees shortly before the consumer completes the transaction. ACC ¶¶ 4-6, 17-19. Plaintiffs allege that consumers who encounter additional fees after investing time selecting a service may proceed with the purchase despite the higher total because abandoning the transaction would require additional time and effort. Id. ¶¶ 20-23. The ACC illustrates the alleged practice through screenshots of a freelancer's logo-design Gig. According to the ACC, the freelancer's page displayed a "Basic" package for $40 and later invited the consumer to select a button marked "Continue ($40)."

ACC ¶¶ 55-60. The fuller listing submitted by Fiverr identifies the displayed amount as a starting price. Lamm Decl. ¶ 8; ECF No. 32 at 6. At the final checkout screen, Fiverr separately identifies the $40 Seller charge, a $5.20 service fee, and a total charge of $45.20 above a button marked "Confirm & Pay." ACC ¶¶ 62-63.

Plaintiffs do not allege that Fiverr charged an amount greater than the total displayed at checkout, misstated the service fee amount, or prevented a Buyer from declining to complete the purchase. They instead contend that Fiverr should have included its service fee in the amount displayed earlier in the purchasing process.

**c. Plaintiffs' Accounts and Transactions**

Plaintiffs each allege that they purchased a freelance service through Fiverr and encountered a service fee after selecting the service they wished to purchase. ACC ¶¶ 64-89.

**i. Andrew Miller**

Mr. Miller registered his Fiverr account in March 2018. Katz Decl., Ex. B at 2. His account history reflects four purchases before the transaction challenged here, including mobile app and logo design services, each carrying a Fiverr service fee. Id. at 3. On January 6, 2025, Mr. Miller purchased website development

services. ACC ¶¶ 64-65. Mr. Miller discussed the project with the Seller and received an individualized $80 Custom Offer. Katz Decl. ¶ 7; Katz Decl., Ex. C. The contemplated work included the development of a website with an Amazon affiliate link. Katz Decl., Ex. C. Mr. Miller used a $30 credit from an earlier order, and Fiverr therefore calculated its service fee on the remaining $50 rather than the full $80. Katz Decl. ¶ 7. Before Mr. Miller completed the purchase, Fiverr displayed a $5.75 service fee and a total purchase price of $85.75. ACC ¶¶ 67-68.

Mr. Miller alleges that he believed the $80 amount included all mandatory charges, that he relied on the amount in comparing services, and that he would have made a different purchasing decision had Fiverr displayed the total earlier. Id. ¶¶ 69-72. He also alleges that he intends to use Fiverr again in the future. Id. ¶ 73.

**ii. Jonathan Hageman**

Mr. Hageman registered his Fiverr account in January 2014. Katz Decl., Ex. D at 2. His order history reflects three purchases before the transaction at issue, including logo design and three-dimensional-modeling services, each of which carried a Fiverr service fee. Katz Decl., Ex. D at 3. On December 31, 2024, Mr. Hageman purchased Bible study outlines and other devotional

materials. ACC ¶¶ 74-75. The ACC alleges that he selected a service "listed at $35." Id. ¶ 76. Mr. Hageman discussed the project with the Seller and received a $35 Custom Offer. Katz Decl. ¶ 9, Ex. E. The commissioned project involved creating a program that matched Bible verses to each of the 720 minutes in a 12-hour cycle. Katz Decl., Ex. E. Before completing the transaction, Fiverr displayed a $4.93 service fee, bringing the total price to $39.93. ACC ¶¶ 77-78. Mr. Hageman alleges that he believed the $35 amount was the complete price, other than taxes or shipping, relied on the $35 price in comparing services, and would have chosen a different service or made no purchase had the total been displayed sooner. Id. ¶ 79-80.

Mr. Hageman's account history reflects additional Fiverr purchases made after the challenged transaction, including logo design services that similarly carried service fees. Katz Decl., Ex. D at 3. Mr. Hageman also alleges that he intends to purchase additional services through Fiverr. ACC ¶ 81.

**iii. Marcus Johnson**

Mr. Johnson registered his Fiverr account in October 2017. Katz Decl., Ex. A at 2. His account information identifies him as the "owner ceo" of an e-book publishing business and describes the business as a startup or side project. Id. at 3. Before the

transaction challenged here, Mr. Johnson made 75 purchases through Fiverr. Id. at 4-5. His account history reflects purchases of, inter alia, book-writing and book-design services, illustrations, logos, websites, software development, and marketing. Id.

On August 1, 2024, Mr. Johnson purchased designs for a book cover and a cartoon mascot. ACC ¶¶ 82-83. The Seller's charge was $35, and the checkout screen identified the purchase as including "Commercial Use." Id. ¶¶ 84-86. Fiverr separately displayed a $4.93 service fee and a total of $39.93 before Mr. Johnson completed the transaction. Id. ¶¶ 85-86. Mr. Johnson alleges that he believed the initially displayed $35 amount was the complete price and that he relied on that amount in comparing the service to other options. Id. ¶¶ 87-88. He further alleges that he would have purchased a different service or made no purchase had the $39.93 total been displayed earlier. Id. ¶ 88.

Mr. Johnson's account history reflects that he continued to purchase Fiverr services after the challenged transaction, including additional social-media, logo-design, book-design, and illustration services that carried service fees. Katz Decl., Ex. A at 5. Mr. Johnson alleges that he intends to purchase additional services through Fiverr in the future. ACC ¶ 89.

**d. Plaintiffs' Claims**

Plaintiffs seek to proceed on behalf of a nationwide class consisting of U.S. residents who purchased services through Fiverr within the applicable limitations period and a California subclass consisting of California residents who made such purchases on or after July 1, 2024. Id. ¶¶ 90-92. On behalf of the nationwide class, plaintiffs assert claims under sections 349 and 350 of the GBL and under New York common law for unjust enrichment. Id. ¶¶ 101-06, 127-31. On behalf of the California subclass, plaintiffs assert claims under the CLRA, the FAL, the UCL, as well as a claim for unjust enrichment under California law. Id. ¶¶ 107-31. Plaintiffs seek damages, restitution, and an injunction prohibiting Fiverr from continuing the challenged pricing practice. Id. ¶¶ 105, 114, 120, 126, 131.

**III. Procedural Background**

On April 1, 2025, Mr. Miller filed his putative class action in this Court. ECF No. 1. Mr. Johnson separately commenced an action in California state court, which Fiverr removed to the United States District Court for the Northern District of California on April 11, 2025. No. 25-cv-5079, ECF No. 1. Fiverr and Mr. Johnson subsequently agreed in June 2025 to transfer the California action to this District for coordination and

consolidation with the Miller action. No. 25-cv-5079, ECF No. 13. On June 16, 2025, Fiverr filed a pre-motion letter in support of a proposed motion to dismiss Mr. Miller's complaint. ECF No. 18. Mr. Miller opposed Fiverr's request on June 20, 2025. ECF No. 21. On August 5, 2025, the Court held a teleconference with the parties to discuss the proposed motion and consolidation. Thereafter, the Court approved the parties' stipulation to consolidate the actions and entered a briefing schedule on August 11, 2025. ECF No. 25.

Plaintiffs filed a consolidated complaint on September 8, 2025 and, after seeking leave to add Mr. Hageman as plaintiff, filed the operative ACC on October 14, 2025. ECF Nos. 26, 28, 29. On November 18, 2025, Fiverr moved to dismiss the ACC, ECF No. 32 ("Mot."), and submitted a request for judicial notice together with two supporting declarations and accompanying exhibits, ECF Nos. 32-1, 33, 34. Plaintiffs opposed the motion on January 9, 2026, ECF No. 37 ("Opp."), and Fiverr filed its reply on January 30, 2026, ECF No. 38 ("Reply"). Plaintiffs filed a Notice of Supplemental Authority on March 6, 2026, identifying a recent minute order from the Superior Court of California for the County of Orange in Ingram v. Greens Global, Inc., No. 30-2025-01504940-CU-BT-CXC. ECF No. 40. Fiverr responded to plaintiffs' Notice on March 16, 2026. ECF No. 41.

**IV. Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court accepts the truth of the pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

**DISCUSSION**

Fiverr seeks dismissal of the ACC on several grounds. First, Fiverr argues plaintiffs cannot state a claim under the CLRA because they did not purchase the challenged services for personal, family, or household purposes. Mot. at 16-19. Second, Fiverr contends that plaintiffs, all California residents, cannot invoke the GBL because their transactions did not occur in New York. Id.

at 19-20. Next, Fiverr argues that its pricing practices would not mislead a reasonable consumer and that plaintiffs fail to plead actual reliance, causation, or injury. Id. at 21-29. Fiverr further contends that plaintiffs' UCL and unjust enrichment claims fail on additional grounds, that the voluntary payment doctrine bars recovery, and that plaintiffs are not entitled to injunctive relief. Id. at 29-34. We begin with whether Fiverr's practice is likely to mislead a reasonable consumer.[2]

**I. Fiverr's Pricing Practice Is Not Deceptive**

While plaintiffs invoke several statutory and common law theories, most of their claims depend on the same threshold premise that Fiverr's presentation of its service fee is deceptive. Claims under sections 349 and 350 of the GBL, the CLRA, the FAL, and the fraudulent prong of the UCL are governed by the objective reasonable consumer standard. See, e.g., In re KIND LLC "Healthy and Natural" Litig., 627 F. Supp. 3d 269, 280-82 (S.D.N.Y. 2022),

[2] Fiverr also contends that plaintiffs lack Article III standing because they do not plausibly allege an injury caused by the challenged pricing practice. Mot. at 26-29. The Court is satisfied that plaintiffs have adequately alleged standing to seek retrospective relief. Each plaintiff alleges that he paid a service fee that Fiverr was not legally entitled to obtain through the allegedly deceptive practice. ACC ¶¶ 68, 78, 86. The payment of money constitutes an alleged economic injury, the payments were made to Fiverr, and damages or restitution would address the alleged harm. Whether plaintiffs were actually deceived into making those payments, and whether they adequately allege reliance, causation, or statutory injury, is a merits question addressed below. See SM Kids, LLC v. Google LLC, 963 F.3d 206, 212 (2d Cir. 2020) (distinguishing the validity of contractual or merits questions from Article III standing).

aff'd sub nom. Bustamante v. KIND, LLC, 100 F.4th 419 (2d Cir. 2024); Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008); Housey v. Procter & Gamble Co., 2022 WL 874731, at *2 (S.D.N.Y. Mar. 24, 2022), aff'd 2022 WL 17844403 (2d Cir. Dec. 22, 2022).[3] The Court therefore begins with the common question of whether Fiverr's challenged practice is likely to mislead a reasonable consumer. The Court separately addresses whether California Civil Code section 1770(a) imposes a distinct pricing requirement independent of that inquiry.

**a. The Challenged Practice Would Not Mislead a Reasonable Consumer**

Under the reasonable consumer standard, a challenged representation, omission, or practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." Housey, 2022 WL 874731, at *2 (quoting Fink v. Time Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013)). This objective standard requires more than a mere possibility that a representation might be misunderstood by a small number of consumers acting unreasonably. Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir.

[3] See also Ackerman v. Coca-Cola Co., 2010 WL 2925955, at *15 (E.D.N.Y. July 21, 2010) (analyzing claims under the GBL, UCL, FAL, and CLRA using the reasonable consumer standard); In re Frito-Lay N. Am., Inc. All Nat. Litig., 2013 WL 4647512, at *13 (E.D.N.Y. Aug. 29, 2013) (applying the reasonable consumer standard to claims brought under GBL, UCL, FAL, and CLRA).

2016). Rather, there must a probability that a significant portion of the general consuming public, or of the targeted consumers, could be misled while acting reasonable under the circumstances. Id.; see also In re KIND, 627 F. Supp. 3d at 282. It is "well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." Housey, 2022 WL 874731, at *2 (quoting Chufen Chen v. Dunkin' Brands, Inc., 954 F.3d 492, 500 (2d Cir. 2020)); see also Seljak v. Pervine Foods, LLC, 2023 WL 2354976, at *13 n.13 (S.D.N.Y. Mar. 3, 2023).

Context is critical to that determination. A court must consider the challenged presentation as a whole, including any qualifying language and other information made available to the consumer, rather than isolating one statement or screen from the surrounding transaction. Fink, 714 F.3d at 742; Mantikas v. Kellogg Co., 910 F.3d 633, 636-37 (2d Cir. 2018). The relevant question here, therefore, is whether a significant portion of reasonable consumers, viewing Fiverr's purchase process in context, would likely understand Fiverr to represent that the first amount displayed was the complete amount payable. Plaintiffs allege that Fiverr engages in "drip pricing" by displaying one price when a consumer begins searching for a service and adding a

mandatory service fee after the consumer has invested time selecting a freelancer and service. ACC ¶¶ 4-9, 17-22, 52-63. However, plaintiffs do not allege that Fiverr affirmatively describes the first amount displayed as the "total," "final," or "all-in" price. Nor, when the purchase process is viewed as a whole, would a reasonable consumer understand it that way.

Fiverr is not a typical retailer displaying fixed prices for uniform products, instead operating as an online marketplace through which independent freelancers offer a myriad of digital services, or "Gigs," to prospective buyers. Katz Decl. ¶ 2; Lamm Decl., Ex. G §§ 2-4. Under Fiverr's Terms of Service, Sellers create the Gigs and determine the pricing at their sole discretion, and services may be offered at a base starting price. Lamm Decl., Ex. G §§ 3, 4.1-4.2. Sellers may also provide individualized Custom Offers in response to a Buyer's requirements. Id. §§ 2, 4.1, 4.6. The marketplace materials identify the amounts accompanying Gig listing as "From" or "Starting at" a particular price. Lamm Decl., Ex. F at 3-4, 18. Those qualifiers communicate that the displayed figure is an initial or baseline amount, and the ensuing purchase process reinforces that understanding. A prospective Buyer engages in a multistep process in which the buyer first browses for a freelancer, may communicate directly with the

freelancer regarding the project, and then places an order by choosing a Gig package or requesting a Custom Offer. Lamm Decl., Ex. I at 2-3; Lamm Decl., Ex. G § 2 (defining "Gig Page" as the page on which the Seller describes the Gig and the buyer may purchase it). Specifically, a Buyer can select among Gig Packages at different prices, purchase additional "Gig Extras," or obtain a Custom Offer. Lamm Decl., Ex. G §§ 2, 4.1, 4.6. The amount charged by the freelancer can thus depend on the scope and specifications of the project selected by the Buyer.

The ACC's illustrative transaction confirms that the earlier amount is not presented as a final total. The ACC reproduces a freelancer's offer of a logo-design service and characterizes the service as "priced at $40." ACC ¶¶ 55-58. The next screen identifies the selected package and invites the buyer to "Continue ($40)," but expressly states that the buyer will not yet be charged. Id. ¶¶ 59-60. The buyer then proceeds to a checkout screen that separately identifies the $40 charge for the Gig, a $5.20 "Service fee," and a total of $45.20 immediately above the button marked "Confirm & Pay." Id. ¶¶ 61-63. Thus, before the buyer authorizes payment, Fiverr conspicuously states both the exact fee and the exact total that the buyer will pay should it continue with the transaction.

Fiverr's Payment Terms provide additional context and expressly disclose that a service fee applies to Gig purchases and identify its calculation. As of June 2024, the fee was 5.5% of the purchase amount, with an additional $3 charge for purchases under $100. Lamm Decl., Ex. H § 3.1. The Payment Terms further state that service fees are added "at the time of purchase where [the buyer] can review and accept the total amount requested to pay." Id. Accordingly, once the freelancer's charge has been fixed, neither the existence nor the calculation of Fiverr's service fee is undisclosed, and the checkout screen identifies the precise service fee amount before the buyer pays.

The ACC identifies no representation that the amount charged by the freelancer included every charge associated with purchasing the service through Fiverr. It does not allege that the service fee or the final total was obscured at checkout, that Fiverr misstated the fee, that Fiverr ultimately charged more than the displayed total, or that the buyer was unable to decline the transaction after reviewing the complete amount. In this respect, Morales v. SportsEngine, Inc., 2025 WL 2662134 (S.D.N.Y. Sep. 17, 2025), is instructive. There, the plaintiffs alleged that a mandatory processing fee was not disclosed until it appeared as a line item in the purchaser's shopping cart before a purchase is

completed. Id. at *5. As the court explained, there could be no deception where purchasers knew that they were paying the fee and had an opportunity to decline the transaction. Id. (dismissing GBL claims because the fee was "fully disclosed prior to Plaintiffs' purchase" and therefore could not be materially misleading). Here too, Fiverr separately itemized the service fee, displayed the exact total, and required the buyer to affirmatively select "Confirm & Pay" before completing the purchase.[4] ACC ¶ 62.

Plaintiffs attempt to distinguish that straightforward transaction process by focusing on the time and effort that a buyer may have invested before reaching the checkout screen. They allege that consumers "feel committed" to a purchase after selecting a freelancer and may proceed despite an increased total because abandoning the transaction would produce dissatisfaction or require additional effort. ACC ¶¶ 20-22. The ACC attributes this behavior to psychological anchoring, sunk costs, and the endowment effect. Id. ¶¶ 21-31. Those allegations merely offer a reason

---

[4] Nor is this a case in which qualifying information elsewhere contradicts a prominent and unambiguous promise. For example, in Mantikas, a prominent representation on the front of the package conveyed an allegedly false message that could not be corrected by additional fine print information elsewhere on the label. 910 F.3d at 636-39. Here, Fiverr makes no affirmative representation that the freelancer's baseline or starting amount is an all-in price. The checkout disclosure accurately reflects the complete price of a transaction whose precise terms and scope have developed during the purchasing process.

that a consumer, after learning the total price, may choose to accept or reject that total price. Indeed, in a twenty-first century economy characterized in part by the abundance of online marketplaces and countless purchasing options, it is hardly unusual for a consumer, after investing some time, to express frustration at the prospect of starting over when an additional charge appears. But plaintiffs' allegations, which merely describe that inertia, fall substantially short of establishing that Fiverr deceived the consumer about the price. Put differently, the reasonable consumer standard asks whether the challenged practice is likely to create a mistaken understanding, not whether the sequence in which information is presented may affect consumer behavior.

In sum, plaintiffs' theory reduces to the proposition that Fiverr should disclose its service fee earlier. Certain consumers may prefer that practice, but the issue before the Court is whether Fiverr's actual presentation, viewed in context, is likely to mislead reasonable consumers about the amount that they will pay. Given the marketplace setting, the "From" and "Starting at" language, the advance disclosure of the fee and its calculation, and, most importantly, the clear itemization of the precise fee and total before the buyer actually agrees to payment, the Court

concludes that it is not. That conclusion follows from Fiverr's purchase process generally. As discussed below, plaintiffs' claim of deception is even less plausible when considered in conjunction with their individual histories with the platform.

**b. The Named Plaintiffs Were Not Deceived**

The contemporaneous records of the named plaintiffs' own transactions further foreclose a plausible inference that Fiverr's purchase process misled them. At a minimum, each claim requires a causal connection between the challenged conduct and the alleged economic injury. The California claims based on deception further require actual reliance, meaning that absent the alleged misrepresentation, plaintiffs would not have purchased the product. Ramos v. EyeBuyDirect, Inc., 2025 WL 2633103, at *10 (C.D. Cal. Aug. 27, 2025) (citing Clark v. Perfect Bar, LLC, 816 F. App'x 141, 142 (9th Cir. 2020)). While reliance is not an independent element of a claim under GBL § 349, plaintiffs must still allege that they suffered injury "as a result of" the challenged deception. Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 490 (2d Cir. 2014).

The ACC alleges that each plaintiff believed the amount initially displayed represented the complete price of the service and would have made a different purchasing decision had Fiverr

disclosed the service fee sooner. ACC ¶¶ 69-72, 79-80, 87-88. Those allegations are simply incompatible with, and indeed plainly refuted by, the records of plaintiffs' own longstanding use of Fiverr. As an initial matter, none of the named plaintiffs was unfamiliar with Fiverr or its service fees. Mr. Johnson's challenged purchase was his 76th Fiverr order. Katz Decl., Ex. A at 4-5. His order history, dating all the way back to 2017, included dozens of transactions for which Fiverr charged a service fee. Id. Mr. Miller's challenged transaction was his fifth Fiverr order, and each of his four prior orders reflected a service fee. Id., Ex. B at 3. Mr. Hageman likewise placed three Fiverr orders before placing a fourth, and all carried a service fee. Id., Ex. D at 3. These plaintiffs could not have actually believed that the amount charged by a freelancer represented the entirety of the amount payable because their own transaction histories informed them otherwise. The ACC's assertions that plaintiffs were deceived because they believed Fiverr would impose no service fee and relied on that belief are flatly contradicted by the primary records of plaintiffs' prior activity on the platform.[5]

---

[5] Because none of the named plaintiffs could plausibly have been deceived by Fiverr's inclusion of a service fee based on their prior use of the platform, they likewise could not pursue claims on behalf of a putative class based on that alleged deception. See, e.g., Kell v. Lily's Sweets, LLC, 2024 WL 1116651, at *3 (S.D.N.Y. Mar. 13, 2024) (explaining that in an alleged class action, "a

The context surrounding Messrs. Miller's and Hageman's purchases further undermines their asserted reliance on a "listed" price. Mr. Miller did not select the website services advertised for $80, instead communicating directly with the freelancer regarding the project's requirements and, after those discussions, accepting a Custom Offer for $80. Katz Decl. ¶ 7, Ex. C at 6, 9-10. Mr. Hageman likewise communicated with a freelancer regarding his proposed project and accepted a $35 Custom Offer to create a Bible-study plan and compile verses corresponding to each of the 720 minutes in a twelve-hour cycle. Id. ¶ 9, Ex. E at 5-7. Therefore, the amounts plaintiffs characterize as misleadingly "listed" prices were, as to Messrs. Miller and Hageman, prices contained in individualized proposals issued after direct communications concerning the scope of the requested work. Those plaintiffs cannot plausibly allege that they purchased in reliance

---

plaintiff must show 'that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent'") (quoting Lewis v. Casey, 518 U.S. 343, 357 (1996)). The Court further notes that the ACC contains no reference to the named plaintiffs' prior use of Fiverr, much less the transaction histories that Fiverr provided to the Court. Plaintiffs' counsel is reminded of Rule 11's directive to conduct a reasonable inquiry before filing the ACC to ensure that its contentions had evidentiary support. See Fed. R. Civ. P. 11(b); Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 551 (1991). Had counsel done so, the Court assumes that this action would not have been brought.

on an isolated price when the contemporaneous communications show that their purchases resulted from specific Custom Offers.

Further, any possible ambiguity was eliminated before plaintiffs authorized payment. Mr. Miller was shown the $5.75 service fee and the $85.75 total before completing his transaction, and Messrs. Hageman and Johnson were each shown a $4.93 service fee and a $39.93 total. ACC ¶¶ 67-68, 77-78, 85-86. Each plaintiff elected to complete the purchase. As discussed above, that disclosure renders the practice nondeceptive from the perspective of a reasonable consumer generally. As to these specific, repeat users, each of whom knew from prior transactions that Fiverr charged a service fee, the contention that the disclosed fee came from an unexpected and unpleasant revelation is particularly implausible.[6]

Plaintiffs therefore fail to identify any reliance or economic injury attributable to deception. This is not a case where plaintiffs were deceived for the first time and then

---

[6] Plaintiffs' actual and planned subsequent conduct is also relevant. After the transaction challenged here, Mr. Johnson continued purchasing services through Fiverr through November 1, 2025, after the consolidated complaint and ACC were filed, repeatedly paying service fees on those orders. Katz Decl., Ex. A at 5. Mr. Hageman similarly completed two additional Fiverr purchases in January and February 2025, both of which included service fees. Id., Ex. D at 3. All three plaintiffs also allege that they intend to use Fiverr again. ACC ¶¶ 73, 81, 89. These subsequent purchases only undercut plaintiffs' conclusory assertions that the timing of Fiverr's disclosure caused them to make purchases they otherwise would not have made.

considered continued purchases. Indeed, plaintiffs' prior payment of service fees followed repeated exposure to the same charges, clear disclosure of the precise amounts before payment, and affirmative acceptance of the total prices. Plaintiffs' apparent preference for an earlier disclosure does not support an inference that Fiverr's presentation induced the purchases or caused any resulting loss. Accordingly, even apart from the failure of plaintiffs' generalized reasonable consumer theory, the named plaintiffs do not plausibly allege actual deception, reliance, causation, or statutory injury resulting from Fiverr's challenged practice.

## II. The Individual Claims Fail

Because each statutory claim either requires actionable deception and an injury caused by that deception or depends on a predicate violation premised on the same allegedly deceptive conduct, the conclusions discussed above largely dispose of the ACC's claims. Plaintiffs' unjust enrichment claim is likewise derivative of their drip-pricing theory.

### a. New York General Business Law

To state a claim under sections 349 or 350 of the GBL, a plaintiff must plead facts showing that (i) the challenged transaction was consumer-oriented, (ii) defendant engaged in

deceptive or materially misleading acts or practices, and (iii) plaintiff was injured as a result. Binder v. Premium Brands Opco LLC, 2024 WL 2978506, at *5 (S.D.N.Y. June 11, 2024) (citations omitted). For the reasons already discussed, Fiverr's pricing practice was not deceptive or materially misleading, and plaintiffs do not plausibly allege that any deception caused them to pay the service fees. Count I therefore fails. Further, Count I is independently deficient because sections 349 and 350 of the GBL apply only where "the transaction in which the consumer is deceived . . . occur[s] in New York." Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 324 (2002). All three plaintiffs here reside in California, and the ACC does not allege that any plaintiff viewed the challenged prices, placed an order, or made a payment in New York. ACC ¶¶ 13-16. The fact that Fiverr maintains its principal place of business in New York does not supply the missing New York connection.[7]

[7] In their opposition, plaintiffs argue that Fiverr designs and operates its website from New York and receives orders and payments through that website in New York. Opp. at 13-14. However, the ACC contains no such corresponding allegations and alleges only that Fiverr maintains its principal place of business in New York. ACC ¶ 16. A plaintiff may not amend its complaint through assertions made in opposition to a motion to dismiss. Alghanim v. Alghanhim, 828 F. Supp. 2d 636, 656 (S.D.N.Y. 2011) (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)).

**b. Consumers Legal Remedies Act**

The CLRA authorizes suit by a "consumer" who suffers damage "as a result of" a practice declared unlawful by California Civil Code Section 1770. Cal. Civ. Code § 1780(a). A "consumer" is defined as an individual who acquires "goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). To the extent that Count II rests on the same theory that Fiverr's pricing presentation was deceptive, it fails for the reasons already discussed. Further, even if Section 1770 independently prohibited Fiverr's presentation of the service fee, plaintiffs must still plausibly allege that they actually relied on the challenged misrepresentation or omission and suffered resulting damage. Ramos, 2025 WL 2633103, at *10. Plaintiffs' prior payment of Fiverr fees, their knowledge of the precise fees before completing the challenged transactions, and their subsequent conduct foreclose a plausible inference that the timing of the disclosure induced their purchases or caused them economic loss.

In addition, the ACC recites the conclusion that plaintiffs are statutory "consumers," but it alleges no facts showing that any plaintiff purchased the challenges service for a qualifying personal, family, or household purpose. ACC ¶ 108. The judicially

noticed records instead reflect commercial uses. Mr. Johnson's Fiverr account identifies him as the owner and chief executive officer of an e-book publishing business, and his challenged order included commercial-use rights. Katz Decl., Ex. A at 3; ACC ¶ 86. Mr. Miller obtained website development services through a Custom Offer for a website that included an Amazon affiliate link. ACC ¶¶ 64-65; Katz Decl. ¶ 7, Ex. C. Mr. Hageman likewise commissioned a customized content project through direct communications with a freelancer. Katz Decl., Ex. E. Plaintiffs' conclusory assertion of statutory consumer status is belied by the records of plaintiffs' transactions themselves, and Count II is therefore dismissed.

**c. False Advertising and Unfair Competition Laws**

The FAL prohibits advertising that is untrue or misleading and that the advertiser knew, or reasonably should have known, was untrue or misleading. Cal. Bus. & Prof. Code § 17500. A plaintiff must also plead actual reliance and an economic injury caused by the challenged advertising. See Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 326-27 (2011). Because Fiverr's pricing presentation was not misleading and the named plaintiffs do not plausibly allege reliance or resulting loss, Count III fails. The ACC's allegation that plaintiffs spent money they otherwise would

not have spent depends entirely on the deceptive pricing theory rejected above. ACC ¶¶ 116-20.

Plaintiffs' UCL claim is afflicted with similar deficiencies. The UCL defines unfair competition to include any "unlawful, unfair or fraudulent" business act or practice, thereby creating three independent theories of liability: the unlawful prong borrows violations of other laws; the fraudulent prong reaches conduct likely to deceive reasonable consumers; and the unfair prong reaches independently unfair business practices. Cal. Bus. & Prof. Code § 17200; Kearns v. Ford Motor Co., 567 F.3d 1120, 1127 (9th Cir. 2009). Here, the fraudulent prong fails for the reasons discussed above, and the unlawful prong fails because no CLRA or FAL predicate survives. The unfair prong merely relabels the same pricing practice as "unethical bait and switch advertising" without identifying the distinct conduct or injury that could independently sustain the claim. ACC ¶¶ 121-26. Accordingly, Count IV is dismissed.

**d. Unjust Enrichment Claims**

Finally, Count V alleges that Fiverr's retention of the service fees was unjust because the fees were procured through "unlawful and misleading drip pricing[.]" ACC ¶¶ 127-31. This theory rises and falls with plaintiffs' consumer protection

claims. Because Fiverr accurately disclosed the fees and total prices before plaintiffs authorized payment, plaintiffs identify no inequitable conduct that would make Fiverr's retention of the fees unjust. Accordingly, Count V is dismissed.

In sum, the Court dismisses Counts I through V with prejudice.[8] The Court need not reach Fiverr's alternative reliance on the voluntary payment doctrine.[9]

**III. Injunctive Relief**

Plaintiffs also seek to enjoin Fiverr's challenged pricing practice. Because the Court has dismissed each of plaintiffs' substantive claims, there is no underlying violation upon which

---

[8] In a single substantive sentence, plaintiffs request leave to replead should the Court find Fiverr's arguments persuasive. Opp. at 21. The Court denies that request. Mr. Miller and Mr. Johnson each filed original complaints, and the consolidated complaint has already been amended once. ECF Nos. 1, 26, 29. Further, plaintiffs' claims fail for reasons that no additional allegations could cure, namely because (i) Fiverr's pricing practice is not deceptive as a matter of law, and (ii) the named plaintiffs here cannot plausibly allege deception, given their history with the platform. Plaintiffs also fail to identify what, if any, facts they could allege if afforded yet another opportunity, or how such amendment would cure the ACC's deficiencies. Courts routinely deny such cursory requests, see, e.g., Mansour v. Stanley, 2026 WL 636874, at *13 (S.D.N.Y. Mar. 6, 2026), and we do so here.

[9] The voluntary payment doctrine generally precludes recovery of payments made voluntarily, with full knowledge of the relevant facts, and in the absence of fraud or mistake of material fact. See Berryman v. Reading Int'l, Inc., 763 F. Supp. 3d 596, 607 (S.D.N.Y. 2025). There is no need for the Court to decide whether the doctrine provides another basis for dismissal given that plaintiffs' claims fail on other grounds.

injunctive relief may be granted. Plaintiffs' request for an injunction is therefore denied.[10]

**CONCLUSION**

For the foregoing reasons, defendant's motion is granted. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 31 and close case numbers 25-cv-2684 and 25-cv-5079.

Dated: August 21, 2026
New York, New York

Naomi Reice Buchwald

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[10] Plaintiffs also lack standing to seek prospective relief. A plaintiff requesting an injunction must demonstrate a likelihood of future injury, and a past purchaser who is now aware of an allegedly deceptive practice cannot ordinarily establish that he is likely to be deceived by it again. See Davis v. Hain Celestial Grp., Inc., 297 F. Supp. 3d 327, 339 (E.D.N.Y. 2018) ("To the extent that plaintiff was deceived by defendants' products, he is now aware of the truth and will not be harmed again in the same way. He therefore lacks standing to seek an injunction."). Plaintiffs allege that they intend to use Fiverr again, ACC ¶¶ 73, 81, 89, but they know that Fiverr charges a service fee, how that fee is calculated, and that the precise fee and total are disclosed prior to payment. Accordingly, plaintiffs face no likelihood of suffering the same alleged deception in the future.